**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

**TONY PRATT**                                                                           **PLAINTIFF**

**V.**                                                                          **NO. 4:15-CV-00009-DMB-JMV**

**MUTUAL OF OMAHA INSURANCE
COMPANY; and UNITED OF OMAHA
LIFE INSURANCE COMPANY, a**
**Mutual of Omaha Company**                                                **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This breach of contract action is before the Court on the motion for summary judgment of

Defendants Mutual of Omaha Insurance Company and United of Omaha Life Insurance

Company.  Doc. #37.  For the reasons below, the motion for summary judgment will be granted.

### I
### Summary Judgment Standard

"Summary judgment is appropriate when there are no genuine issues as to any material

facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transp.*

*A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 22–23 (1986)).  To award summary judgment, "[a] court must be satisfied

that no reasonable trier of fact could find for the nonmoving party or, in other words, that the

evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a

verdict in her favor."  *Norwegian Bulk Transp. A/S,* 520 F.3d at 411–12 (internal quotation

marks and citation omitted).  To this end, "[t]he moving party bears the burden of establishing

that there are no genuine issues of material fact."  *Id.* at 412.

"If … the nonmoving party bears the burden of proof at trial, the moving party may

demonstrate that it is entitled to summary judgment by submitting affidavits or other similar

evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998) (citation omitted). If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 191–92 (5th Cir. 2011) (citation and internal punctuation omitted). When considering a motion for summary judgment, the Court "resolve[s] factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## II
## Factual Background

### A. Parties

Defendant United of Omaha Life Insurance Company ("United of Omaha") is a subsidiary of Defendant Mutual of Omaha Insurance Company ("Mutual of Omaha"). *See* Doc. #25 at ¶ 3;[1] Doc. #30 at ¶ 3; Doc. #31 at ¶ 3. Plaintiff Tony Pratt is a resident citizen of Leland, Mississippi. Doc. #37-1 at 6.

### B. Tony's Initial Purchase of Life Insurance Coverage

Sometime around 2000, Tony[2] started buying health insurance coverage for himself and various members of his family. Doc. #37-1 at 48. Tony explained he made this decision

---

[1] This citation is to the amended complaint. When considering a defendant's motion for summary judgment, a court may consider the allegations of a complaint as admissions or stipulations. *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 195 (5th Cir. 1988).

[2] To avoid confusion, the Court will refer to members of the Pratt family by their first names.

because:

> As family members were dying, my mother whom always asked me to pay for the funeral because at the time I guess I was probably the only one that seemed to have had a little bit of success, and I end up paying for funerals that perhaps was 6 and $7000 out of my family. So that's where instead of paying big lump sums of money on funerals I instead – I'd rather have insurance to cover my family so that we would have funds to bury people and help take care of my family when needed.

*Id.*

Over the ensuing years, Tony purchased eleven life insurance policies for himself and various family members from companies other than United of Omaha ("Non-Omaha Policies"): (1) a policy from American General; (2) a policy from State Farm Life Insurance Company ("State Farm"); (3) three policies from Liberty National; (4) four policies from Chesapeake; (5) one policy from Occidental Insurance Company; and (6) one policy from the Independent Order of Foresters ("IOF").[3]  Doc. #37-1 at 26–44.  Tony purchased the Occidental, Chesapeake, and Liberty policies from George Henry, an insurance agent. *Id*. at 45–46.  He purchased the State Farm policy from agent Noel Williams, and the American General policy from agent Ruth Brown. *Id*. at 46.  The agent for the IOF policy is not apparent from the record.

With the exception of the State Farm policy, each of the Non-Omaha Policies remain in effect. *Id*. at 41–44.  Tony is the owner and beneficiary of the American General, Liberty, Chesapeake, and Occidental policies. *Id*. at 41–43.  The owner and beneficiaries of the IOF policy are not indicated in the record.

---

[3] The purchased policies were:  (1) a policy from American General, covering himself; his wife, Jennifer Pratt; and their children, Takyala and Jatonius Pratt, Doc. #37-1 at 7, 26; (2) a policy for himself and Jennifer, which has since expired, from State Farm, *id*. at 28–29; (3) a policy from Liberty National Life Insurance Company ("Liberty"), for Maurice Watson, one of Tony's cousins, *id*. at 29, 31; (4) a policy from Liberty National for Lottie Pratt, one of Tony's aunts, *id*. at 29–30; (5) a policy from Liberty National for Willie Prettie, Tony's mother's nephew, *id*.; (6) a policy from Chesapeake for Jakeiah Johnson, one of Tony's stepdaughters, *id*. at 34, 36; (7) a policy from Chesapeake for Orenthia Watson, one of Tony's cousins, *id*. at 34, 37; (8) a policy from Chesapeake for Kimberly Watson, one of Tony's stepdaughters, *id*.; (9) a policy from Chesapeake for Derek Watson, whose connection to Tony is unknown, *id*. at 35–36; (10) a policy from Occidental Insurance Company for Steven Watson, Tony's aunt's daughter's son, *id*. at 41, 43; (11) a policy from IOF for Terry Pratt, Tony's uncle, *id*. at 43–44.

### C. Purchase of United of Omaha Policies

Sometime around 2010, Tony began purchasing United of Omaha life insurance policies through George Henry. Doc. #37-1 at 53–54; Doc. #26-1–Doc. #26-29;[4] Doc. #37-4.[5] Tony explained he made the switch to United of Omaha at Henry's suggestion because "I'm looking for ways I can save money, what the premiums [are]. That's what I look at, what I can afford." Doc. #37-1 at 54. At some point, Tony told "every one that was close to [him], family, friends, [that] if they wanted insurance now is that time to get it, that [he] would pay for it." *Id*. at 58.

### 1. United of Omaha Policy Application Form

During the time period relevant to this suit, United of Omaha utilized a standard series of forms for life insurance applications. *See* Doc. #26-1–Doc. #26-9. Each form series sets forth the terms governing the relevant insurance policy and includes sections for the applicant to provide pertinent information, including the identity of the proposed insured, plan information, the identity of the plan owner, and the identity of the plan beneficiary. *See id.*

Each policy application contains a merger clause, which provides:

**Entire Contract**

The entire contract is:

> (a) this policy;
> (b) the attached signed application;
> (c) any supplemental applications made part of the policy;

---

[4] Tony's insurance contracts were submitted originally with the amended complaint filed in this action. *See* Doc. #26-1–Doc. #26-9. Defendants have incorporated these documents into the exhibits submitted with their motion for summary judgment. Doc. #38 at 3 n.4.

[5] Citing Rule 1006 of the Federal Rules of Evidence, Defendants proffered a "summary chart" purporting to show the details of the various United of Omaha policies purchased by Tony. Doc. #38 at 3 n.4. Rule 1006 provides that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings … that cannot be conveniently examined in court" if the proponent "make[s] the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." There is no dispute the relevant policies, which total more than 1,000 pages, are voluminous, or were made available to Tony. *See United States v. Jennings*, 724 F.2d 436, 441–42 (5th Cir. 1984) (chart summarizing 200 pages of documents admissible under Rule 1006). Tony does not challenge the contents of Defendants' summary. Accordingly, the summary chart will be considered in evaluating the motion for summary judgment.

        (d) any Riders; and
        (e) any endorsements and amendments.

All statements made in the application(s) will, in the absence of fraud, be considered representations and not warranties. We will not use any statement in defense of a claim or to contest this policy unless it is in an application.

Any change made to the policy requires an Executive Officer's written consent. An agent does not have the authority to change the policy or waive any of its terms.

*See, e.g.,* Doc. #26-21 (Form B738LMS07P, at 4) (emphasis in original). An Executive Officer, in turn, is defined as "the chief executive officer or corporate secretary of United of Omaha Life Insurance Company." *See, e.g.*, *id*. (Form B738LMS07P, at 1).

Furthermore, each application form contains a section labeled "**OWNER**," which directs that the applicant should "**Complete Policyowner information if Proposed Insured is not the Policyowner**." *See, e.g.*, *id*. (Form ICC09L034A, at 3) (emphases in original). According to Karen J. Dukes, a Reinstatement Underwriter with United of Omaha, "[t]he determination of ownership of a life insurance policy is made at the time the application of insurance is completed by the proposed insured." Doc. #37-2 at ¶ 3. If the proposed insured fails to complete the "OWNER" section, then it is presumed that "the applicant has intended for the applicant/proposed insured to be the owner of the policy." *Id*.

With regard to ownership and beneficiaries, the forms provide:

**<u>Owner</u>**

The owner is:

(a) the insured; or
(b) the applicant, if other than the insured.

While the insured is alive, only you, the owner, may exercise the rights under the policy, subject to the consent of any irrevocable Beneficiary. You may name a new owner by assigning the policy as described in the **Assignment** provision.

**Assignment**

An assignment is a transfer of all or some of the policy's rights and benefits to someone else.  If you assign the policy, your rights and the rights of the Beneficiary are subject to the terms of the assignment.

You may change the owner of this policy by making an absolute assignment or you may pledge the policy as collateral by making a collateral assignment.  An assignment must be made by Written Request.  If the Beneficiary designation in effect is irrevocable, the Beneficiary must also sign the Written Request.

An assignment of the policy or of an interest in the policy will not be binding on us until we have recorded it.  We are not responsible for the validity or effect of any assignment.

**Beneficiary**

While the insured is alive, you may name one or more Beneficiaries to receive the death benefits ….

You may change the Beneficiary by sending us a Written Request.  If the Beneficiary designation in effect is irrevocable, the Beneficiary must also sign the Written Request.

Doc. #26-21 (Form B738LMS07P, at 3–4) (emphasis in original).  The forms define a "Written Request" as "a request, in writing, signed by [the owner of the policy], dated, and submitted to our home office.  The request must be on a form we supply or be of a form and content acceptable to us."  *Id*. (Form B738LMS07P, at 2).

Also of relevance here, the application forms contain the following provisions related to premium payments:

**Premium Payments**

The first premium is due on the Issue Date.  Subsequent premiums are payable in advance on or before the premium due date as shown on the data pages.  Premiums may be paid:

(a) annually;
(b) semi-annually; or
(c) at other intervals we offer.

You may pay premiums at our home office or to an authorized agent. …

**Grace Period**

There is a grace period of 31 days to pay each premium except the first premium. The policy stays in force during the grace period. If the insured dies on the premium due date or during the grace period, the premium due for the policy month in which the insured dies will be subtracted from the death benefits. If you do not pay any premium by the end of the grace period, the policy will Lapse as of the premium due date. You may put the policy back in force by meeting the requirements of the **Reinstatement** provision.

**Reinstatement**

If the policy Lapses before the Expiration Date, you may reinstate it within three years after the date of Lapse. To reinstate the policy, you must:

(a) submit a written application signed by you and the insured;
(b) provide evidence of insurability that we accept;
(c) pay all past due premiums plus interest at an effective annual interest rate of 6%; and
(d) pay the premium due from the beginning of the policy month reinstatement occurs to the next premium due date.

If all of the above requirements are met and we approve the application for reinstatement, reinstatement will be effective as of the date of Lapse.

*Id*. (Form B738LMS07P, at 2–3) (emphases in original).

## 2. Purchased Policies

Over approximately a three-year period, Tony purchased twenty-nine policies from United of Omaha.[6] Analytically, these policies, which cover insureds ranging from Tony's children to Tony's friends, may be separated into four categories: (1) ten policies in which Tony is identified as owner and a beneficiary ("Owner/Beneficiary Policies"); (2) thirteen policies in which Tony is identified as an owner but not a beneficiary ("Owner Policies"); (3) five policies

---

[6] In his response brief, Tony represents that he purchased "at least 32 insurance policies." Doc. #41 at 2. However, only twenty-nine policies appear in the record. It appears three applications were denied. *See* Doc. #40-1 at ¶ 9(b). Tony's response requests "a written explanation as to the reason the application [sic] was [sic] denied." Doc. #41 at 4. No authority, however, is cited for this relief, and a claim based on these denied policies is not apparent in the amended complaint.

in which Tony is identified as a beneficiary but not an owner ("Beneficiary Policies"); and (4) one policy in which Tony is identified as neither owner nor beneficiary ("No-Interest Policy").[7] *See* Doc. #37-4. Tony arranged to make the necessary payments through automatic drafts and signed each application as "payor." Doc. #37-1 at 56–57, 102. *See, e.g.,* Doc. #26-24 (Form ICC09L035A, at 6).

In executing these policies, Tony expressed to Henry a desire to be the owner and beneficiary for each policy and was "under the assumption" that he was the beneficiary and owner of all the policies. Doc. #37-1 at 58, 60. However, when Henry returned the executed policies to Tony, Tony "kept them under [his] bed" without looking at them. *Id*. at 61.

### D.  Cancelation of Policy BU1331405

In July 2013, Tony stopped the automatic draft payments for policy BU1331405, a Beneficiary Policy, with Mary A. Boney listed as the insured and owner. *See* Doc. #37-3 at ¶ 5. In early August, Tony authorized a one-time draft to pay for the July premium but did not re-authorize automatic drafting for the policy. *Id*. As a result, Tony failed to pay the August premium for BU1331405. *Id*. On October 28, 2013, United of Omaha sent Mary Boney a notice of cancelation regarding the policy. Doc. #37-2 at Ex. 2. The notice was sent to 100 Oak Street, Arcola, Mississippi, 38722, the same address provided on the application for the policy. *Id*.; Doc. #37-1 at 122.

### E.  Stop Request and Subsequent Payment

On July 19, 2013, Tony requested a temporary stop on the automatic bank withdrawals for six policies:  (1) BU1306877 (an Owner/Beneficiary Policy); (2) BU1307000 (an Owner/Beneficiary Policy), (3) BU1307001 (an Owner/Beneficiary Policy); (4) BU13007002

---

[7] The specific policies in each category are itemized in Figures 1 through 4 in Appendix A below.

(an Owner/Beneficiary Policy); (5) BU1307010 (a Beneficiary Policy, with Yolanda Barney listed as owner); and (6) BU1309019 (an Owner/Beneficiary Policy). Doc. #37-3 at Ex. 2; Doc. #37-4.

On August 5, 2013, United of Omaha sent Tony a letter regarding the six policies, stating:

> On July 19, 2013, you requested we place a temporary stop on the automatic bank withdrawal for your life insurance.
>
> One option would be to deduct the July premiums of $3,125.86 from your account and advance your premium due date to August. Or, if you prefer, you may send us $3,125.86 to pay premiums to August.
>
> We would then resume withdrawals in August. Please write your preference on this letter and send it in the enclosed return envelope by August 19, 2013. (If you select the second option, be sure to also include your payment.)[.]
>
> If you do not take advantage of this offer, evidence of insurability will be required to later reinstate this coverage. Waiving the usual requirement of proof of good health does not extend the Grace Period nor change the policies in any way. This offer applies to this premium only and during the lifetime of all persons insured under this coverage. This offer does not apply to future premiums nor establish a precedent.

Doc. #37-3 at Ex. 2. Tony elected to pay the premiums by check. Doc. #37-1 at 57.

## F. Missed Premiums in March and April 2014

In late March of 2014, Tony, as a result of insufficient funds, missed premium payments for the following ten policies: (1) BU1346193 (a No-Interest Policy, with Diann Archie listed as owner and insured and Brandon Bernard listed as beneficiary); (2) BU1346481 (a Beneficiary Policy, with Persheka Bernard listed as insured and owner); (3) BU1309019 (an Owner/Beneficiary Policy, with Cedric Watson listed as insured); (4) BU1331274 (a Beneficiary Policy, with Lola Barney listed as owner and insured); (5) BU1343970 (a Beneficiary Policy, with Jerry Snipes listed as owner and insured); (6) BU1432318 (a Beneficiary Policy, with

Ebony Fults listed as owner and insured); (7) BU1432320 (a Beneficiary Policy, with Dwaine Williams listed as owner and insured); (8) BU1432321 (a Beneficiary Policy, with Demetrica Williams listed as owner and insured); (9) BU1321374 (an Owner/Beneficiary Policy, with Glenn Pratt listed as insured); and (10) BU1331273 (a Beneficiary Policy, with Lottie Pratt listed as owner and insured).  Doc. #37-3 at ¶ 6; Doc. #37-4.

On March 24, 2014, Tony contacted United of Omaha to stop drafts from his account. Doc. #37-3 at ¶ 6; Doc. #25-5.[8]  During this conversation, Tony informed United of Omaha that the March drafts should occur on April 1, 2014, and that automatic drafts should resume on April 28, 2014.  Doc. #25-5.[9]

On April 7, 2014, Tony faxed United of Omaha stating that the March drafts had not been deferred as requested and that, as a result, Tony was assessed overdraft fees by his bank.  *Id.* Tony requested that "all of my Ins. [be taken] off of draft until this matter is cleared up."  *Id.* Approximately two weeks later, on April 22, 2014, Tony called United of Omaha "to stop … drafting on his account for the [ten] policies … because he did not have sufficient funds for a draft on April 28 …."  Doc. #37-3 at ¶ 8.  During the call, Tony "directed that April premiums not be drafted for these policies."  *Id.*

On April 24, 2014, Dolores Sahagun, a Policy Service Analyst at United of Omaha, acting on Tony's request, sent Tony a list of "the policies being drafted from your bank account." Doc. #37-3 at Ex. 1.  The list was composed of the twenty-nine policies Tony initially purchased, less BU1331405, the policy terminated on October 28, 2013.  *See id.*

[8] A copy of correspondence between Tony and United of Omaha was attached to his amended complaint and incorporated by his affidavit submitted in opposition to the motion for summary judgment.  Doc. #40-1 at 2 n.6.

[9] The statements in this document are hearsay.  However, courts may consider hearsay statements at the summary judgment stage where, as here, the opposing party does not raise a hearsay objection.  *See BGHA, LLC v. City of Universal City, Tex.*, 340 F.3d 295, 299 (5th Cir. 2003) (in absence of hearsay objections, court did not err in considering hearsay affidavits for purpose of summary judgment).

Sometime before April 31, 2014, Tony received a reimbursement for the overdraft fees. *See* Doc. #40-1 at ¶ 7. On April 31, 2014, Tony sent Mutual of Omaha a check for $2,035.65 for "All unpaid Policy for March." Doc. #25-6.[10] According to Tony, "[a]t this point, I was of the understanding that all of my policies remained in full force and effect." Doc. #40-1 at ¶ 7.

### G. Termination of Ten Policies and Conversation with Craig Showers

As a result of the requested draft stops, United of Omaha ceased drafting payments on the ten policies and the policies lapsed. *See* Doc. #37-2 at Ex. 2. On July 28, 2014, United of Omaha sent notices of termination for each of the delinquent policies. *See id.* With the exception of BU1346193,[11] the termination notices were sent to the listed owner of each policy at the address listed on the policy application. *Id.*; Doc. #37-1 at 140. Of note, the termination notices for BU1321374 and BU1309019, both Owner/Beneficiary Policies, were mailed to Tony. Doc. #37-2 at Ex. 2; *see also* Doc. #40-1 at ¶ 8.

Upon receiving the cancelation notices, Tony "began to continuously call the company seeking an answer and remedy to the situation." Doc. #40-1 at ¶ 8. In these calls, Tony learned that eleven policies were inactive and three were "not available." *Id.* at ¶ 9.

According to Tony, he continued to call United of Omaha and, at some point in August 2014, he spoke with a man in "management"[12] named Craig Showers. Doc. #37-1 at 85, 87. During their first conversation, Showers said "give me a few days and I'll get back in touch with

---

[10] This exhibit, attached to the amended complaint, was incorporated into the summary judgment record. *See* Doc. #40-1 at 3 n.7.

[11] BU1346193 was sent to Diann Archie, the policy owner, at 4985 Wickham Fen Road, Black Jack, Missouri, 63033-7535. Doc. #37-2 at Ex. 2. However, Archie's listed address on the policy is 4985 Wickham Fen Road, Taylor, Missouri, 63033. Doc. #26-18 (Form ICC09L034A, at 3).

[12] In his affidavit, Tony claims that Showers is "an in-house lawyer with Mutual of Omaha." Doc. #40-1 at ¶ 12.

you."[13]  *Id*. at 85.

Two or three days after this initial conversation, Showers called Tony back and said, "Mr. Pratt, you have not done anything wrong. … [A]ll of these policies [were] taken off of draft [and] it was Mutual of Omaha's fault why they were taken off draft."  *Id*. at 86.  Showers asked for "a few more days" and said he would "come up with the amount that's owed and perhaps … make you owner and beneficiary of all of these policies."[14]  *Id*.  Tony never heard back from Showers and, despite attempting to contact him regarding the proposed changes through calls and e-mails for "several months," could not get in touch with him.  *Id*. at 87.

Sometime later, but before December 19, 2014, Tony "made a written request to Mutual of Omaha."  Doc. #41 at ¶ 14.  The contents and nature of this request are not revealed by the record.

### III
### Procedural History

On December 19, 2014, Tony filed a complaint against Mutual of Omaha in the Circuit Court of Washington County, Mississippi.  Doc. #2.  In his complaint, Tony asserted claims for "Breach of Contract – Express Terms," "Breach of Contract – Implied Terms," and "Bad Faith Breach of Contract" arising from the terminations of the policies.  *Id*.  Mutual of Omaha was served with a copy of the summons and complaint on December 22, 2014.  Doc. #1-1.  On January 20, 2015, Mutual of Omaha, invoking diversity jurisdiction, removed the state court

---

[13] In their reply, Defendants argue that the statements attributed to Showers are hearsay and may not be considered as summary judgment evidence.  Doc. #43 at 7 n.2.  However, statements made by a "party's … employee on a matter within the scope of that relationship" are not hearsay under the Federal Rules.  Fed. R. Evid. 801(d)(2)(D).  Tony has offered evidence that Showers was in a management position with Mutual of Omaha and that the conversations occurred in the context of Tony's discussions regarding his policies.  Under these circumstances, the Court overrules Defendants' hearsay objection to Showers' statements.

[14] In his affidavit, Tony avers that Showers "agreed" to change the owner and/or beneficiaries of the various policies.  Doc. #40-1 at ¶ 12.  However, Tony does not specify the precise changes to which Showers agreed.  *See id*.

action to this Court. Doc. #1. After seeking and receiving an extension of the deadline to answer Tony's complaint, Mutual of Omaha answered the complaint on February 10, 2015. Doc. #8.

On March 2, 2015, Tony filed a motion to amend the complaint but, in violation of Local Rule 7(b)(2), failed to file a proposed amended pleading. Doc. #11. The same day, United States Magistrate Judge Jane M. Virden denied the motion to amend without prejudice for failure to comply with the Court's Local Rules.

Approximately two months later, on April 30, 2015, Tony filed a second motion to amend the complaint, seeking to add the various policy owners as plaintiffs and United of Omaha as a defendant. *See* Doc. #21. Mutual of Omaha responded in opposition to the motion to amend and, on June 10, 2015, Judge Virden granted the motion in part, allowing the addition of United of Omaha, but not the proposed plaintiffs. Doc. #22; Doc. #24. Tony filed his amended complaint on June 16, 2015. Doc. #25. Defendants answered on June 30, 2015. Doc. #30; Doc. #31.

On November 18, 2015, Defendants filed a motion for summary judgment. Doc. #37. Tony responded in opposition on December 2, 2015, and Defendants replied on December 11, 2015. Doc. #40; Doc. #43.

**IV**
**Tony's Subsequent Requests**

During the pendency of this action, Tony, through his attorney, submitted a series of change of ownership and/or beneficiary requests which Mutual of Omaha[15] rejected because the forms were "not acceptable." Doc. #40-1 at ¶ 12. Sometime later, Tony and his attorney

---

[15] Tony represents in his affidavit that Mutual of Omaha rejected the requested changes. Despite Tony's representation, it seems likely the denials came from United of Omaha. However, this discrepancy has no bearing on the resolution of the motion for summary judgment.

submitted a second round of requests which sought to change beneficiaries and/or transfer ownership of the various policies to a newly-formed trust. *See* Doc. #37-2 at Ex. 1. On July 22, 2015, United of Omaha rejected the requested ownership changes for the active policies because the "trust agreement that we received was missing pages" and because Takayla Pratt, the proposed trustee, did not sign the change of ownership forms. *Id*. The requests for the canceled policies were rejected on the grounds that the policies were no longer active. *Id*. The beneficiary change forms were rejected because they were blank. *Id*.

**V**
**<u>Analysis</u>**

The amended complaint asserts the same three causes of action as the original state court complaint: "Breach of Contract – Express Terms;" "Breach of Contract – Implied Terms," which alleges a breach of the duty of good faith and fair dealing; and "Bad Faith Breach of Contract." Doc. #25. Tony brings these claims based on the cancelation of the eleven policies, and Defendants' failure to change owners and beneficiaries of various policies. *Id*. Defendants seek summary judgment on all claims, arguing that Tony lacks standing to assert claims based on policies of which he is not the owner, that Tony has no right to relief against Mutual of Omaha, and that United of Omaha did not breach the relevant agreements. Doc. #38. Because standing is a jurisdictional requirement, the Court will address this threshold issue first. *See Cole v. Gen. Motors Corp.*, 484 F.3d 717, 721 (5th Cir. 2007) ("Before we reach the questions regarding the class certification, we must resolve the standing question as a threshold matter of jurisdiction.").

**A. Standing**

As an initial matter, "[g]ranting summary judgment is an inappropriate way to effect a dismissal for lack of subject matter jurisdiction." *Bank One Tex. v. United States*, 157 F.3d 397, 403 n.12 (5th Cir. 1998). Accordingly, a court should construe a motion for summary judgment

predicated on a lack of jurisdiction as a motion to dismiss. *See Fox v. Leavitt*, 572 F.Supp.2d 135, 140 n.5 (D.D.C. 2008) ("Although CMS's motion requests summary judgment[,] … the request to dismiss based on … lack of standing is properly treated as a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1)."). This Court therefore will analyze Defendants' standing argument as a motion to dismiss for lack of jurisdiction under Rule 12(b)(1).

"A motion to dismiss for lack of standing may be either 'facial' or 'factual.'" *Superior MRI Servs., Inc. v. Alliance Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015). Where, as here, "the defendant submits affidavits, testimony, or other evidentiary materials" in support of the motion, the attack on standing is considered factual. *Id.* (internal quotation marks omitted). "To defeat a factual attack, a plaintiff must prove the existence of subject-matter jurisdiction by a preponderance of the evidence and is obliged to submit facts through some evidentiary method to sustain his burden of proof." *Id.* (internal quotation marks omitted).

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *United States v. Hays*, 515 U.S. 737, 742 (1995) (internal quotation marks and alterations omitted). "To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

Here, Defendants argue that Tony "lacks standing to assert the claims of this suit for all

but two policies for which he was the owner ….”[16]  Doc. #38 at 13.  Tony did not respond to this argument.  In their reply, Defendants, pointing to Tony's failure to respond, contend that "[Tony] has conceded … that he lacks standing to pursue these claims."  Doc. #43 at 4.

The failure to raise an argument in response to a motion to dismiss operates as a waiver of such argument.[17]  *See Jaso v. The Coca Cola Co.*, 435 F. App'x 346, 358 n.12 (5th Cir. 2011) ("Jaso has waived this argument on appeal by failing to raise it below in response to Defendants' motion to dismiss.") (citing *Miller v. Nationwide Life Ins. Co.*, 391 F.3d 698, 701 (5th Cir. 2004)).  Accordingly, where a party's standing to enforce a contract is challenged in a motion to dismiss, the failure to respond justifies dismissal.  *See Rutter v. Conseco Life Insur. Co.*, No. 3:09-cv-680, 2011 WL 2532467, at *5 (S.D. Miss. June 24, 2011) ("Conseco has moved to dismiss the claims … on the grounds that [plaintiffs] have no personal stake in the outcome of the subject life-insurance contract to which they were neither parties nor beneficiaries.  The [plaintiffs] apparently concede the issue, having failed to address it in their Response. Accordingly, the claims … are hereby dismissed.").  *See also Amburgey v. Atomic Ski USA, Inc.*, No. 06-149, 2007 WL 4468707, at *5 (D. Me. Dec. 17, 2007) ("Atomic, a non-party to the Rental/Release Form, failed to address the question of its standing to invoke that contract's benefits, thereby waiving that argument."); *see Allstate Ins. Co. v. Glob. Med. Billing, Inc.*, 520 F. App'x 409, 412 (6th Cir. 2013) ("Plaintiff's failure to respond to Defendants' attack on its

---

[16] According to Defendants' records, Tony owns more than two policies.  *See* Doc. #37-4.  However, because, as explained below, Tony may not state a claim on any of the policies he owns, the precise number of such policies is of no moment.

[17] A similar rule applies when a party's response brief fails to address arguments raised in a motion for summary judgment.  *See Hensley v. Wal-Mart Stores Inc.*, 290 F. App'x 742, 743–44 (5th Cir. 2008) ("This court has consistently held that arguments not raised in response to a motion for summary judgment are waived and cannot be considered on appeal.") (citing *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 339–40 (5th Cir. 2005)); *see also Muniz v. El Paso Marriott*, 773 F.Supp.2d 674, 684 (W.D. Tex. 2011) (colleting cases).

standing and its failure to refute the assertion that it had been fully reimbursed amounts to a waiver of the argument, and we decline to address it on appeal.").

Given Tony's total failure to address the issue of standing, the Court deems waived all claims based on policies of which Tony is not the owner – the Beneficiary Policies and the No-Interest Policy (collectively, "Non-Ownership Policies"). Accordingly, while standing may possibly exist,[18] such claims will be dismissed as waived,[19] with such dismissal being without prejudice to the rights of the listed owners of the Non-Ownership Policies. *See generally Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1066 n.2 (10th Cir. 2012) ("[W]e have no duty to investigate grounds for jurisdiction not raised by a party.") (emphasis omitted). Thus, the Court will only consider the merits of the claims based on the Owner Policies and Owner/Beneficiary Policies (collectively, "Ownership Policies").

---

[18] The standing of a non-owner to enforce a life insurance policy is far from clear. The Mississippi Court of Appeals has strongly suggested that, under Mississippi law, the owner, not the beneficiary, of a policy holds exclusive rights to enforce the policy. *See Evans v. Moore*, 853 So.2d 850, 853–54 (Miss. Ct. App. 2003) ("The policy beneficiary … has a right to the proceeds, which until death is only an expectancy."); *see also Slover v. Equitable Variable Life Ins. Co.*, 443 F.Supp.2d 1272, 1275 n.2 (N.D. Okla. 2006) ("As the beneficiary of the policy, rather than the owner thereof, Plaintiff … has no present legal interest in the policy and, therefore, no standing to bring this suit."). While a judge in this district has held that a payor/purchaser of a policy, such as Tony, has standing to enforce a life insurance policy, the opinion did not specifically consider the elements of standing and relied on dicta from a Texas case. *Jacobs v. Conseco, Inc.*, No. 2:09-cv-132, 2011 WL 902486, at *4 (N.D. Miss. Mar. 15, 2011); *see Gaidon v. Guardian Life Ins. Co. of Am.*, 272 A.D.2d 60, 60 (N.Y. Ct. App. 2000) ("Gaidon lacks standing to sue individually, inasmuch *as it was not he who purchased the policy*.") (emphasis added). Other courts have held that "[o]nly the policy owner has standing to sue based on an insurance policy." *Pike v. N.Y. Life Ins. Co.*, 72 A.D.3d 1043, 1049 (N.Y. Ct. App. 2010); *see Address v. Millstone*, 56 A.3d 323, 333 (Md. 2012) (policy purchaser lacked standing to sue on policies he did not own).

[19] Tony's amended complaint and response to the motion for summary judgment (although not in the context of standing) refer to Tony as a third party beneficiary of the non-owned policies. Doc. #25 at ¶¶ 22, 27; Doc. #41 at 15–16. Tony does not, however, offer any argument or evidence as to why he qualifies as a third-party beneficiary under any of the policies he does not own. This cursory argument amounts to a waiver of the third-party beneficiary argument too. *See Cardenas v. Maslon*, 93 F.Supp.3d 557, 568 (N.D. Miss. 2015) (failure to properly brief issue results in waiver) (citing *United States v. Dominguez-Chavez*, 300 F. App'x 312, 313 (5th Cir. 2008)). Even if the argument was not waived, it seems unlikely Tony would qualify as a third party beneficiary. To be a third-party beneficiary to an agreement, a person must show: "(1) the contract between the original parties was entered for that person's or entity's benefit, or the original parties at least contemplated such benefit as a direct result of performance; (2) *the promisee owed a legal obligation or duty to that person or entity*; and (3) the legal obligation or duty connects that person or entity with the contract." *Simmons Hous., Inc. v. Shelton ex rel. Shelton*, 36 So.3d 1283, 1286 (Miss. 2010) (emphasis added). Tony has failed to identify a single duty owed to him under any of the Non-Ownership Policies.

## B.  "Breach of Contract – Express Terms"

"To prove breach of contract, a claimant must show by a preponderance of the evidence: 1. the existence of a valid and binding contract; and 2. that the defendant has broken or breached it."  *Home Base Litter Control, LLC v. Claiborne Cty.*, 183 So.3d 94, 102 (Miss. Ct. App. 2015) (citing *Bus. Commc'ns, Inc. v. Banks*, 90 So.3d 1221, 1224 (Miss. 2012) (internal quotation marks and alterations omitted).  "[M]onetary damages are a remedy for, not an element of, breach of contract."  *Banks*, 90 So.3d at 1225 (internal emphases omitted).

Here, there is no dispute that the policies are valid and binding contracts.  Accordingly, the pivotal question becomes whether Defendants[20] breached the policies.  To this end, Tony alleges that Defendants breached "Express Terms" of the policies by:  (1) wrongfully canceling the eleven policies, which include Non-Ownership and Ownership Policies; (2) failing to transfer ownership of the Non-Ownership Policies; and (3) failing to transfer beneficiaries for various Non-Ownership and Ownership Policies.  Doc. #25 at ¶¶ 14–20.  In light of the waiver finding above, this Court will confine its analysis to the claims related to the Ownership Policies.

### 1.  Wrongful Cancelation

Tony alleges that:

> Defendants have failed to maintain coverage for the following insured: (a) Lottie M. Pratt; (b) Ebony N. Fultes [sic]; (c) Mary A. Boney; (d) Cedric Watson; (e) Glenn Pratt; (f) Jerry L. Snipes; (g) Dwaine A. Williams; (h) Demetrica F. Williams; (i) Persheka Bernard; (j) Quincy E. Archie; and (l) Lola Barney. This is an express breach of the agreement. Defendants also failed to give proper and adequate notice under the agreement of its cancellation of nine (9) of the terminated polices.

---

[20] As explained above, Mutual of Omaha argues that the claims against it must fail because "[a] parent corporation is not generally liable for the actions committed by its subsidiaries."  Doc. #38 at 14. Tony, citing to a corporate disclosure document that does not appear in the record, responds that Mutual of Omaha "is a proper party to this action because it maintains control of the subsidiary's standards of conduct, [and] is engaged in the day-to-day operations of the subsidiaries marketing activities."  Doc. #41 at 2 n.2. Because this Court ultimately concludes that all of Tony's claims fail, it need not decide whether to pierce the corporate veil as to Mutual of Omaha.

Doc. #25 at ¶ 17.  Of these policies, Tony only has an ownership interest in two – the Cedric Watson policy and the Glenn Pratt policy.  *See* Appendix A.

In their motion for summary judgment, Defendants argue that the policies were properly terminated for non-payment of premiums.  Doc. #38 at 16.  In his response to the summary judgment motion, Tony argues that:  (1) "Mutual of Omaha failed to provide notice as required by the policy regarding the non-payment of premium [sic] and cancellation;" (2) "Mutual of Omaha has failed to allow [Tony] to reinstate the terminated policies;" (3) "Mutual of Omaha has failed to provide notice as required by Miss. Code Ann. § 83-11-5 regarding the non-payment of premiums and cancellation;" and (4) "Mutual of Omaha should be estopped from not accepting any alleged late payment because [Tony] relied upon the parties' course of dealings and [sic] that the company would accept the payments and straighten everything out and continue coverage."  Doc. #41 at 15 (internal emphasis omitted).

### a.  Policy-Required Notice

Tony, without citing to any specific provision in the policies, contends that "Defendants breached the provision governing notice to insureds regarding late or unpaid premiums and/or notices of cancellation due to unpaid premiums."  Doc. #41 at 12.  Defendants reply that "there is no such provision in the … Policies."  Doc. #43 at 2.

The Court has reviewed the relevant policies and found no express provision requiring notice of late or unpaid premiums, or of cancelation.  The policies do, however, provide an "optional" designation of a "Secondary Addressee" to "receive copies of overdue premiums and lapse notices."  *See, e.g.*, Doc. #26-1 (Form ICC09L034A, at 3).  There is no indication Tony ever made such an election or that, if such an election occurred, a notice was not sent.  In the

absence of such evidence, Tony's "express" breach of contract claim must fail.[21]

### b. Reinstatement

Tony, again without citation, argues that "Mutual of Omaha has failed to allow [Tony] to reinstate the terminated policies." Doc. #41 at 15. Defendants reply that this claim must fail because Tony conceded that he failed to comply with the policies' reinstatement provisions. Doc. #43 at 5.

As explained above, the policies require that an owner take four steps to reinstate a lapsed policy: (1) submit a written application of reinstatement; (2) provide acceptable evidence of insurability; (3) pay all past due premiums; and (4) pay the premium due for the reinstatement month. Tony has not alleged, and the evidence does not show, that he satisfied these four steps with regard to any lapsed policy. To the contrary, Tony actually conceded he failed to abide by the reinstatement provision when seeking reinstatement. Doc. #37-1 at 121. In the absence of evidence showing that Defendants failed to reinstate the policy as required by the contract, Tony may not demonstrate that this provision was breached.

### c. Estoppel and Statutory Notice

It is unclear how Tony's estoppel and statutory notice arguments, which do not relate to the text of the policies, are tied to his "express" breach of contract claim. However, whether framed in the context of a breach of contract claim or as an independent cause of action, both arguments fail.

First, § 83-11-5, the Mississippi statute on which Tony relies, applies only to "automobile liability, automobile physical damage, or automobile collision" policies. *See* Miss. Code Ann.

---

[21] Even if notice was required under the policy, the undisputed evidence shows that Defendants mailed notices of cancelation to the listed address for each of the canceled Ownership Policies. Doc. #37-1 at 140.

§§ 83-11-5, 83-11-1(a). Tony has not cited, and this Court has been unable to find, any authority which has applied the notice provision of § 83-11-5 to a life insurance policy.

With regard to estoppel, Tony argues that the parties' "course of dealings" should estop Defendants from refusing to accept late payments. Doc. #41 at 15. The Mississippi Supreme Court has noted:

> [I]f an insurance company, by its habits of business, creates in the mind of a policyholder the belief that payment may be delayed until demanded, or otherwise waives the right to demand a forfeiture, this is binding on the company notwithstanding there may not have been a compliance with the express letter of the policy. Such is the general rule.

*Willis v. Miss. Farm Bureau Mut. Ins. Co.*, 481 So.2d 256, 260 (Miss. 1985) (internal citations omitted).

First, although Tony does not identify the alleged "course of dealings," the Court assumes Tony's argument is based on the alleged conversations between Tony and Showers during which Showers represented that the policies could be revived in a manner other than that provided in the policies. However, Tony does not cite, and this Court has been unable to find, a case where the *Willis* rule was applied where, as here, the alleged "course of dealing" arose after the termination of a policy. Indeed, the Mississippi Supreme Court has strongly suggested the rule was not intended to encompass such a situation. *See Brown v. Progressive Gulf Ins. Co.*, 761 So.2d 134, 139 (Miss. 2000) (noting, "[t]he acceptance of late premiums pursuant to the terms of a policy is an entirely different matter than reviving a policy of insurance once the policy has already been canceled for non-payment of premiums"). Under these circumstances, the Court concludes that the parties' course of dealing does not justify revival of the policy.[22]

---

[22] To the extent Tony's argument may be read as invoking promissory estoppel based on Showers' statements, he has failed to present evidence of detrimental reliance (apart from an unsupported conclusory assertion in his affidavit) or circumstances such that a refusal to enforce the alleged promise "would be virtually to sanction the perpetuation of fraud or would result in other injustice." *See Weible v. Univ. of. Miss.*, 89 So.3d 51, 67 (Miss. Ct.

## 2. Failure to Rename Beneficiaries

Defendants argue that Tony's claims for change of beneficiary must fail because he cannot show that he complied with the contractual terms for such changes. Doc. #38 at 24. Tony responds that "Mutual of Omaha's refusal to accept [his] repeated written requests to change the owner and/or beneficiary of certain active policies is a breach of the express 'Assignment' and/or 'Beneficiary' provisions of the applicable policy." Doc. #41 at 7–8. Tony argues that he made three written requests to change beneficiaries and "[t]he question is whether the refusal of the company to change the … beneficiary … after three (3) written requests [constitutes] a breach of the Assignment and Beneficiary provision of the policy." *Id.* at 11. Defendants reply that Tony has "not shown that he … met the policy provisions for Assignment or Change in Beneficiary before he brought this suit on this claim." Doc. #43 at 6.

As explained above, the policies allow the owner of a policy to change a beneficiary by sending United of Omaha a Written Request, that is "a request, in writing, signed by [the owner of the policy], dated, and submitted to our home office[,] on a form we supply or … of a form and content acceptable to us." *See, e.g.,* Doc. #26-1 (Form B738LMS07P, at 2).

Here, there is simply no evidence that Tony ever submitted a signed, dated, written request to United of Omaha's home office requesting a change in beneficiary. While he has offered an affidavit that he "made a final written request to Mr. Craig Showers to make the changes," and "a written request to Mutual of Omaha," Doc. #40-1 at ¶¶ 12, 14; there is absolutely no evidence of the contents of these requests, including whether the requests were signed or dated. There is also no evidence such requests were sent to United of Omaha's "home office." In the absence of such evidence, the Court cannot conclude that the policies required

App. 2011) ("Detrimental reliance is an element of … promissory estoppel."); *see also Young v. Equifax Credit Info. Servs., Inc.*, 294 F.3d 631, 639 (5th Cir. 2002) ("Conclusory affidavits are not sufficient to defeat a motion for summary judgment.").

United of Omaha to change the beneficiaries. Accordingly, the failure to change the beneficiaries cannot constitute a breach of contract.[23]

### C. "Breach of Contract – Implied Terms"

In his amended complaint, Tony alleges a claim for "Breach of Contract – Implied Terms" based on the allegations that:

> Defendants, upon entering into the life insurance policies and agreements with Mr. Pratt, undertook a separate duty of good faith and fair dealing in the performance of its [sic] Agreements with Mr. Pratt, including the duties of honesty and fairness in the observance of reasonable commercial standards and the avoidance of deception and subterfuge in the performance of its [sic] contract with Mr. Pratt. Mr. Pratt is an intended third party beneficiary.
>
> Additionally, Defendants had an identical duty of good faith and fair dealing in the performance of its insurance contracts with the named policyholders.
>
> Defendants have been, and remains [sic], in breach of the duty of good faith and fair dealing in the performance of its contracts with Mr. Pratt and its policyholders by deceiving them into believing that it [sic] was going to: (1) transfer all policies to Mr. Pratt as the true owner; and (2) maintain or reinstate coverage as the company agreed with Mr. Pratt.

Doc. #25 at ¶¶ 22–24.

In their motion for summary judgment, Defendants argue that Tony cannot show a breach of the duty of good faith and fair dealing or any other implied term because United of Omaha complied with the terms of the policies. Doc. #38 at 20. Tony, without citation to evidence or case law, repeats verbatim the allegations of his complaint. Doc. #41 at 15.

"[A]ll contracts contain an implied covenant of good faith and fair dealing in performance and enforcement." *Gen. Motors Acceptance Corp. v. Baymon*, 732 So.2d 262, 269 (Miss. 1999) (internal alterations omitted). Thus, "[t]he claim of breach of the covenant of good faith [and fair dealing] asserts a claim in tort, one flowing from tortious breach of contract."

---

[23] Although the third wave of written requests was not pled in the complaint, the Court notes that the undisputed evidence shows that the requests were blank. Tony has not argued how these blank requests created a duty on the part of Defendants to change the beneficiaries on the policies.

*Daniels v. Parker and Assocs., Inc.*, 99 So.3d 797, 801 (Miss. Ct. App. 2012) (internal

punctuation and alterations omitted). "Tortious breach of contract requires, in addition to a

breach of contract, some intentional wrong, insult, abuse, or negligence so gross as to constitute

an independent tort." *Banks v. S. Farm Bur. Cas. Co.*, 912 So.2d 1094, 1098 (Miss. Ct. App.

2005).

As explained above, Tony has not established a genuine issue of material fact as to the

existence of a breach of the policies he owns and, therefore, he may not assert a breach of good

faith and fair dealing claim on such policies. *See id.*

### D. "Bad Faith Breach of Contract"

In his amended complaint, Tony brings a claim for "Bad Faith Breach of Contract" based

on the allegations that:

> Defendants have intentionally, willful, [sic] and/or with gross negligence
> breached the express terms of the Agreement with Mr. Pratt by: (a) failing and
> refusing to transfer all polices to Mr. Pratt as the true owner; and (b) failing to
> maintain or reinstate coverage as the company agreed with Mr. Pratt.
>
> Defendants, acting and/or failing to act as set forth herein, has [sic] intentionally
> and in bad faith acted with willfulness, malice, gross negligence, and reckless
> disregard for the rights of its policyholders and Mr. Pratt, as third party
> beneficiaries to all of the agreements. Mr. Pratt is the payor and/or beneficiary to
> mostly all of the policies. Such acts are the equivalent of a breach of Defendants'
> Agreement with Mr. Pratt and were done without a legitimate or arguable reason
> and, thereby, evince a wanton and reckless disregard for the rights of Mr. Pratt
> and/or Defendants' policyholders, thereby entitling Mr. Pratt to recover damages,
> as set forth herein.

Doc. #25 at ¶ 26–27. In their motion for summary judgment, Defendants argue that, because

Tony cannot show a breach of contract, "there was no 'bad faith' breach of contract.'" Doc. #38

at 24. Tony, once again, responds with a verbatim recitation of the allegations in his amended

complaint. Doc. #41 at 16.

"Although styled a tort, an action for bad-faith breach of contract is created by contract and requires proof of a breach of contract." *Schoonover v. W. Am. Ins. Co.*, 665 F.Supp. 511, 516 (S.D. Miss. 1987) (citing *Aitken v. State Farm Mut. Auto. Insur. Co.*, 404 So.2d 1040, 1045 (Miss. 1981)). Accordingly, "[w]here there is no breach of contract, there can be no tortious breach of contract." *Birdsong v. Lincoln Nat. Life Ins. Co.*, No. 3:10-cv-699, 2012 WL 5026437, at *6 (S.D. Miss. Oct. 17, 2012).

For the reasons above, the Court concludes that Tony has not shown a breach of any of the Ownership Policies and may not assert a bad faith cause of action based on breaches of any of the Non-Ownership Policies. Accordingly, summary judgment will be granted on the bad faith breach of contract claims.

## VI
## Conclusion

For the reasons above, Defendants' motion for summary judgment [37] is **GRANTED**.

**SO ORDERED**, this 28th day of March, 2016.

/s/ **Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**